**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | |
|---|---|
| KATRON EVANS,<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>Defendant. | Civil Action No. ________________<br><br>**JURY TRIAL DEMANDED** |

**<u>COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES</u>**

Plaintiff KaTron Evans ("Plaintiff" or "Evans"), by and through counsel, and for his Complaint against the National Collegiate Athletic Association ("Defendant" or "NCAA"), states as follows:

**NATURE OF THE ACTION**

1. Evans is a talented collegiate football player and student who comes to this Court as a last resort and as a direct result of the NCAA's unlawful conduct, which has prevented him from playing football for North Carolina State University ("NC State") for the 2026–27 season. Unless this Court grants Evans both immediate and lasting relief, he will suffer irreparable harm. He will forever lose the opportunity to complete his football career at NC State – an opportunity that, once lost, cannot be recovered – as well as significant Name, Image, and Likeness ("NIL") compensation, revenue-sharing compensation, a full athletic scholarship, and on-field development critical to his pursuit of a career in the National Football League ("NFL").

2. With respect to Evans, the NCAA has unlawfully foreclosed his access to the modern intercollegiate athletics market by denying the extension-of-eligibility waiver submitted

on his behalf by NC State. The NCAA's decision, however, rests on a broader scale adoption of arbitrary eligibility rules, as well as application of an adjudication process that denies athletes any right to directly challenge eligibility decisions or advocate on their own behalf. Evans brings this action to challenge the NCAA's conduct on two primary, independent grounds: (1) the NCAA's eligibility rules and waiver-denial process constitute an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 and (2) the NCAA breached its contractual obligations and the implied covenant of good faith and fair dealing owed to Evans as an intended third-party beneficiary of the NCAA's Constitution and Bylaws.

3. The NCAA's eligibility rules are horizontal agreements among competing member institutions that restrain trade in the nationwide labor market for Division I football players. In the modern world of college athletics, where athletes earn NIL compensation and member institutions compensate athletes directly, those rules operate as a classic price-fixing agreement facilitated by the NCAA to exercise monopsony power over the labor market for athlete services. The rules are agreed to solely by NCAA members – not the athletes those rules purport to regulate – and athletes have no right to petition the NCAA directly or participate in the adjudication of their own eligibility. Since the Supreme Court's decision in NCAA v. Alston, 594 U.S. 69 (2021), courts have applied antitrust scrutiny to the NCAA's eligibility rules under the rule of reason and have found those rules constitute unreasonable restraints of trade. The NCAA's Five-Year Rule and its waiver-denial process, both as applied to Evans and on a broader, market-wide scale, constitute an unreasonable restraint of trade with no legitimate procompetitive justification.

4. Evans – like all NCAA athletes – is also an intended third-party beneficiary of the NCAA's Constitution and Bylaws, which constitute a binding contract among the NCAA and its member institutions. Courts across the country have confirmed that those agreements were

executed for the direct benefit of athletes and that the NCAA owes athletes a duty of good faith and fair dealing in administering its eligibility and waiver processes. *See, e.g., Bloom v. NCAA*, 93 P.3d 621, 623–24 (Colo. App. 2004) ("the NCAA's constitution, bylaws, and regulations evidence a clear intent to benefit athletes"); *Oliver v. NCAA*, 920 N.E.2d 196, 200 (Ohio Ct. Com. Pl. 2008); *Battle v. NCAA*, No. 1:23-CV-101, 2024 WL 4685604, at *4 (N.D.W. Va. May 28, 2024); *Chambliss v. NCAA*, No. 36CH1:26-CV-00017-W, Dkt. 22, at 18–19 (Miss. Ch. Ct. Feb. 13, 2026); *Washington v. NCAA*, No. 26-0896-III, at 23–24 (Ch. Ct. Davidson Cnty., Tenn. July 31, 2026); *Godfrey v. NCAA*, No. 26CV05617, at 5–6 (Super. Ct. Cobb Cnty., Ga. Aug. 5, 2026); *Borovicanin v. NCAA*, No. A2603352, at 7 (Hamilton County Ct. Com. Pl., Ohio, July 9, 2026). The NCAA breached its contractual obligations and duty of good faith by denying Evans relief while granting comparable waivers to other similarly situated athletes, and a blanket-denial directive in its adjudication process.

5. The facts demonstrate that Evans's collegiate career was repeatedly derailed by tragedy and institutional upheaval. He enrolled at Jackson State University to play for Coach Deion Sanders, beginning his five-year eligibility clock in the fall of 2021. During his freshman season, Evans played in seven games and started multiple contests as an active contributor to Jackson State's defense.

6. In the fall of 2022, Evans' participation was limited and counted as a "redshirt" year. The season did not count against his four seasons but did consume a year of his five-year eligibility clock.

7. During that same fall, Evans suffered devastating personal losses. His cousin "Tay-Tay," who had functioned as an older sister throughout his life and was his primary practical and emotional support, was murdered on October 15, 2022. Just five days later, a close friend was also

murdered. Around the same time, Jackson State's coaching staff – including Coach Deion Sanders – departed for other programs, leaving Evans without the institutional support and continuity he had relied upon.

8. Evans then transferred to UNC Charlotte in January 2023, but the tragedies continued. His great-aunt, who had lived with his family and helped raise him, died suddenly and mother faced eviction proceedings. Those compounding hardships overwhelmed Evans during the spring 2023 semester, causing him to struggle academically. Without institutional support and recognition of his personal hardships, his GPA – which had reset to 0.0 as a result of his transfer – fell below the required standards. Evans took summer classes to improve, but tragedy struck again when a close friend and former teammate of his died by suicide. As a result of his academic struggles over two semesters at a new school, Evans was declared academically ineligible for the 2023 football season. Despite the cascade of personal tragedy, UNC Charlotte never filed a progress-toward-degree waiver on Evans's behalf. UNC Charlotte has since acknowledged that it did not "exhaust all options" to assist him.

9. In the face of the foregoing, Evans persevered and recovered from that crisis. He earned a 2.75 GPA the very next semester, regained his eligibility, played the 2024 season at Charlotte, transferred to Marshall for the 2025 season, earned his bachelor's degree with a 3.37 GPA – including a 3.66 GPA in his final semester – and was named team captain.

10. In January 2026, Evans transferred to NC State to pursue his final season of competition and to be closer to his mother's home. After becoming aware of Evans' history of personal tragedy and the clear and obvious effect it had on his 2023 season, NC State submitted an extension-of-eligibility waiver on March 10, 2026. The NCAA denied the waiver, denied

reconsideration, and denied Evans's appeal on July 24, 2026 – just days before preseason training camp was scheduled to begin on July 29, 2026.

11. As a result of the NCAA's denial, Evans has been reclassified as an "alumni player" and faces immediate and irreparable harm including: the loss of his scholarship, the loss of NIL income his family depends upon, the loss of coaching and team access, the loss of an NFL development opportunity associated with a final season, and separation from the support system that has been his primary source of stability throughout a career marked by repeated personal tragedy.

12. Accordingly, Evans seeks immediate declaratory and injunctive relief compelling the NCAA to grant him one additional season of competition for the 2026-27 season at NC State, together with compensatory damages, trebled as provided by law, attorneys' fees, and all other appropriate relief.

**PARTIES**

13. Plaintiff KaTron Evans is a twenty-four-year-old citizen and resident of Raleigh, Wake County, North Carolina. Evans is currently enrolled as a student at NC State and, but for the NCAA's conduct described herein, would be a member of the NC State football team. Evans has used three seasons of competition. Absent the relief sought, his five-year eligibility clock – which began in fall 2021 – expired at the end of the spring 2026 semester.

14. Defendant NCAA is a private, unincorporated association with its principal place of business at 700 W. Washington Street, Indianapolis, Indiana 46206-6222. The NCAA includes among its members numerous public and private colleges and universities located within North Carolina, including NC State. Through its Constitution, Bylaws, eligibility rules, waiver processes,

and enforcement mechanisms, the NCAA governs intercollegiate athletics nationwide, including Division I football.

## JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction over Evans's federal antitrust claim pursuant to 28 U.S.C. §§ 1331 and 1337 because that claim arises under the Sherman Antitrust Act, 15 U.S.C. §§ 1-7, and the Clayton Act, 15 U.S.C. §§ 12-27. This Court has supplemental jurisdiction over Evans's state-law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy and arise from a common nucleus of operative fact.

16. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred here, including the NCAA's denial of the eligibility waiver submitted by NC State, which is located in Wake County within this District. Personal jurisdiction over the NCAA is proper because the NCAA transacts substantial business in North Carolina, purposefully directs its Bylaws and eligibility decisions to North Carolina institutions and athletes, and has member institutions, including NC State, located within this District. The NCAA's contacts with North Carolina are continuous, systematic, and give rise to the claims asserted herein.

## STATEMENT OF FACTS

### A. The Applicable NCAA Bylaws and Intent to Benefit Athletes Like Evans

17. The NCAA is a private association whose member institutions adopt and amend the NCAA Constitution, Division I Manual, and Bylaws. Those governing documents establish the eligibility rules and waiver procedures that determine whether an athlete may compete, receive athletics-related financial aid, and access NIL and revenue-sharing opportunities. A true and

correct copy of relevant excerpts of the NCAA Constitution and the NCAA 2025-2026 Division I Manual are attached hereto as Exhibit 1.

18. NCAA Bylaw 12.6.1, commonly known as the Five-Year Rule, provides that a athlete must complete the athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the athlete first registers for a minimum full-time program of studies at a collegiate institution. The rule governs the period in which an athlete may use seasons of intercollegiate competition and as applied here, caused Evans's eligibility clock to expire before he could complete four actual seasons of football.

19. Bylaw 12.6.1.7 authorizes the Committee on Student-Athlete Reinstatement, by a two-thirds majority of its members present and voting, to approve waivers of the Five-Year Rule "as it deems appropriate." The Bylaw gives the Committee affirmative authority to grant relief when the facts warrant an additional season of competition.

20. Bylaw 12.6.1.7.1 states that a waiver of the five-year period of eligibility "is designed to provide a athlete with the opportunity to participate in four seasons of intercollegiate competition within a five-year period." The waiver may be granted when, among other circumstances, "[t]he student-athlete is deprived of the opportunity to participate for more than one season in his or her sport within the five-year period of eligibility for reasons that are beyond the control of the student-athlete or the institution."

21. Bylaw 12.6.1.7.1.1 identifies circumstances "considered to be beyond the control of the student-athlete or the institution." Those circumstances include situations clearly supported by contemporaneous documentation showing that an athlete is unable to participate because of incapacitating physical or mental circumstances; inability to participate as a result of a life-threatening or incapacitating injury or illness suffered by a member of the athlete's immediate

family; and extreme financial difficulties resulting from a specific event, such as a layoff or death in the family, experienced by the athlete or an individual upon whom the athlete is legally dependent.

22. Bylaw 12.6.1.7.1.2 identifies circumstances "within the control" of the athlete or institution, including a redshirt year and an inability to participate due to failure to meet institutional, conference, or NCAA academic requirements. As set forth below, the NCAA improperly applied those categories to Evans without considering that both his redshirt and his academic ineligibility resulted directly from circumstances beyond his control and that the totality of his circumstances deprived him of genuine participation opportunities.

23. Bylaw 12.6.1.7.1.3 provides that the Committee on Student-Athlete Reinstatement "reserves the right to review requests that do not meet the more-than-one-year criteria of this waiver for circumstances of extraordinary or extreme hardship." This provision confirms that the Committee's authority is not limited to mechanical application of the ordinary criteria and exists to prevent exceptional hardship from producing an unjust result.

24. NCAA Bylaw 14.4.3.3 imposes a progress-toward-degree requirement on an athlete entering the third year of collegiate enrollment. The athlete must present a cumulative minimum grade-point average equal to at least ninety-five percent of the institution's overall cumulative GPA required for graduation. That NCAA-wide requirement, rather than any lack of academic ability, was the requirement Evans did not satisfy after the spring and summer 2023 semesters.

25. Bylaws 14.4.3.7 and 14.4.3.10 authorize the Progress-Toward-Degree Waivers Committee to waive the progress-toward-degree GPA requirement based on objective evidence demonstrating circumstances that warrant relief. The waiver framework contemplates consideration of the athlete's academic record, the size of the deficiency, the likelihood of

graduation, an academic recovery plan, and documented compelling mitigation showing that the athlete would have met the requirement but for the extraordinary circumstances.

26. Bylaws 12.10.1 and 12.10.2 make the institution – not the athlete – the applicant and gatekeeper for restoration of eligibility. An institution may appeal to the Committee on Student-Athlete Reinstatement, and any appeal must be submitted in the institution's name by specified institutional officials, including the president or chancellor, faculty athletics representative, senior woman administrator, or athletics director. Evans had no independent right to submit his own waiver, reconsideration request, or appeal and was required to rely on UNC Charlotte, Marshall, or NC State to present his case.

27. The NCAA Constitution's Preamble states that the Association is "committed to the well-being and development of student-athletes" and that the "basic purpose" of the NCAA is to "support and promote healthy and safe intercollegiate athletics" and the athlete "as an integral part of the student body." Ex. 1. The Constitution further provides that intercollegiate athletics programs "shall be conducted in a manner designed to protect, support, and enhance the physical and mental health and safety of student-athletes" and that such programs "provide student-athletes with the opportunity to participate in sports and compete as a vital, co-curricular part of their educational experience." Ex. 1.

28. The Five-Year Rule does not incidentally affect athletes. It directly controls whether an individual may compete and therefore has direct, life-altering consequences, including whether the individual may receive athletics-related financial aid, institutional compensation, NIL compensation, and the training and exposure necessary to pursue professional athletics. The NCAA Manual and Bylaws contain provisions addressing direct payments to athletes, NIL activities, and athlete well-being, and eligibility is a prerequisite to accessing those benefits. Ex. 2.

The eligibility and waiver provisions, therefore, operate directly for the benefit of the athletes whose seasons and careers they regulate.

29. The waiver process exists solely for the benefit of athletes who face hardship. No other party benefits from the grant of a waiver in the same direct and individualized manner as the athlete whose opportunity to compete is restored. The process is designed to prevent an athlete from losing a season because of circumstances outside the athlete's control and to provide the four seasons of competition the Bylaw promises.

30. The NCAA Division I Student-Athlete Reinstatement Committee subscribes to a "students-first philosophy," ensuring that the individual athlete as well as the general athlete body is at the forefront of each decision. That stated philosophy is consistent with the Constitution, the waiver criteria, and the direct benefits the eligibility framework confers on athletes.

31. Courts have routinely recognized that athletes are intended beneficiaries of the NCAA's contractual arrangements with its member institutions. Those authorities accord with the text and structure of the NCAA's governing documents. The Constitution, Bylaws, eligibility rules, and waiver process identify athletes as the class whose opportunity to participate is being protected and restored. Evans is a member of that class, and the NCAA's promises concerning eligibility, well-being, fairness, and individualized hardship review were made for his direct benefit.

**B. Evans' Background and Early Football Career**

32. Evans was born on July 21, 2002, and was raised in Norfolk, Virginia, in a household with his mother, great-aunt, and grandmother. His mother raised him largely on her own. Evans grew up with very limited family resources, but his family worked to support his education and his football ambitions.

33. Evans's cousin, whom he called "Tay-Tay," was approximately three years older and functioned as an older sister. She lived only minutes away, and Evans spoke with her frequently. Because Evans's mother does not drive and no one in Evans's immediate family has a driver's license, Tay-Tay drove him to football practice and other activities and sent him money and care packages while he was away at school during high school and college.

34. Evans began playing organized football at approximately age seven. He attended Granby High School in Norfolk for his freshman and sophomore years. During his freshman year, he received a scholarship offer from Virginia Tech, confirming his early promise as a football player.

35. Evans transferred to St. Frances Academy in Baltimore, Maryland for his junior and senior years. St. Frances operated a private, boarding-style football program under Coach Biff Poggi. In 2019, Evans helped lead the team to an 11–1 record and a No. 4 national ranking.

36. Coming out of high school, Evans was a consensus four-star recruit and was ranked in the ESPN 300 as a defensive tackle. Evans received scholarship offers from thirty-nine schools

37. Evans originally committed to the University of Tennessee, but he decommitted after the coaching staff was fired. He then committed to Jackson State University to play for Coach Deion Sanders, whose program and staff had recruited Evans and promised the institutional support and development that Evans sought.

38. Evans enrolled full-time at Jackson State in the fall of 2021. During his freshman season, Evans started multiple games and was an active contributor to Jackson State's defense.

39. During the 2022 season at Jackson State, Evans played sparingly, as a result of coaching decisions and personal tragedy. Because Evans played in fewer than four games during the 2022 season, his "redshirt" was preserved under the NCAA's four-game football rule. As a

result, the 2022 football season did not use a season of competition in 2022, even though the year consumed a year of his five-year clock.

### C. Fall 2022 Tragedies

40. In October 2022, while Evans was enrolled at Jackson State, his cousin Tay-Tay was murdered. On October 15, 2022, she was caught in crossfire in Norfolk. Four people were in the same car, three were shot, and Tay-Tay was the only person who died. No one has ever been prosecuted for her murder.

41. Evans learned of Tay-Tay's murder approximately one day later. His coaches allowed him to travel home for the funeral on October 25, 2022. He was home for only approximately forty-eight hours before returning to Jackson State.

42. Five days after Tay-Tay's murder, on October 20, 2022, the boyfriend of his cousin – Tay-Tay's sister – was murdered. His funeral was heavily guarded by police because of the risk of retaliation and continuing neighborhood conflict.

43. Tay-Tay had been a source of primary support for Evans. She drove him to and from football practice and other activities, maintained frequent contact with him, and sent him money and care packages while he was away at school. Her violent death, followed five days later by the murder of Evans's close friend, left Evans devastated.

44. Around the same time in the fall of 2022, Jackson State's coaching staff – including Coach Deion Sanders and staff members who had recruited and mentored Evans – departed the program for other positions. Sanders left for the University of Colorado. The departures left Evans without the institutional support and continuity that had brought him to Jackson State. Facing the compounding weight of violent loss and institutional upheaval, Evans made the decision to transfer.

**D. Evans Transfer to UNC Charlotte, Additional Tragedies, and 2022-2023 Academic Crisis**

45. In December 2022, Evans transferred to the University of North Carolina at Charlotte ("UNC Charlotte") to reunite with Coach Biff Poggi, his former high school head coach, who had become UNC Charlotte's head football coach and had brought Evans's former high school position coach onto his staff. Evans enrolled at UNC Charlotte for the spring 2023 semester, hoping to rebuild his academic and athletic career with familiar coaches and a stable support system.

46. Upon transferring to UNC Charlotte, although many of Evans's credits from Jackson State transferred, Evans's cumulative GPA reset to zero. Evans had earned approximately a 2.3 cumulative GPA over three semesters at Jackson State, but that academic history did not provide any GPA cushion at UNC Charlotte, and he began a new academic record while, at the same time, adjusting to a new institution and coping with the tragedies described above.

47. During the same period, Evans's mother faced eviction proceedings in Norfolk. Evans used approximately $600 of his approximately $1,600 monthly stipend from UNC Charlotte to pay the arrears necessary to prevent his mother and younger sister from losing their home. He continued sending money home while his mother worked to resolve the matter.

48. On March 23, 2023, during Evans's first semester at UNC Charlotte, his great-aunt died suddenly. She had lived with Evans's family and helped raise him. Her death was the third death of someone close to Evans within approximately five months.

49. The cumulative weight of the two murders, his great-aunt's sudden death, and his mother's potential homelessness overwhelmed Evans's ability to function academically during the spring 2023 semester.

50. Evans ended the spring 2023 semester with two D's, one F, and one B, resulting in a 1.25 semester GPA.

51. Had UNC Charlotte recognized the personal tragedies and cost to Evans, UNC Charlotte could have assisted Evans and adjusted his academic load and course choices – including "pass-fail" options.

52. During the summer, Evans enrolled in additional summer coursework to recover his academic standing. Because of his spring grades, he needed to enroll in a heavy course load to make up his GPA. Evans, however, could not recover. His cumulative GPA at the end of the summer was approximately 1.57, below UNC Charlotte's 1.9 requirement for continued eligibility.

53. During the same time, in August 2023, Evans's close friend and former youth-football teammate, Tajh Boyd, died by suicide. Boyd had played football at Liberty University on scholarship, and Evans had known him since approximately age thirteen or fourteen. Despite the rash of personal tragedies, no one at UNC Charlotte guided Evans toward mental-health resources despite these circumstances and his obvious academic hardship.

54. At the end of the summer, UNC Charlotte declared Evans academically ineligible for the fall 2023 football season because he did not satisfy the progress-toward-degree GPA requirement. Evans did not play a single game during the 2023-24 academic year.

55. UNC Charlotte never filed a progress-toward-degree waiver for Evans under NCAA Bylaws 14.4.3.7 or 14.4.3.10, notwithstanding the documented circumstances and the available waiver process. UNC Charlotte's compliance office later acknowledged that it did not "exhaust all options" to assist Evans. Evans was not advised that a PTD waiver could be pursued, and no one guided him toward mental-health resources or otherwise ensured that the NCAA's hardship mechanisms were fully considered. Even if Evans had known about the PTD waiver, he could not pursue that waiver directly under the NCAA Bylaws.

### E. Academic and Athletic Recovery at Charlotte and Graduation from Marshall

56. Evans sat out the fall 2023 semester and continued taking classes. He earned a 2.75 GPA that semester, demonstrating that the spring and summer academic crisis was the product of extraordinary trauma rather than a lack of academic ability. He regained his academic eligibility in the spring of 2024.

57. Evans played the 2024 football season at UNC Charlotte and appeared in all twelve games.

58. Evans transferred to Marshall University for the 2025 season and played eleven games. His return to consistent competition after the 2023 academic crisis demonstrated his continued athletic ability and commitment to his education and football career

59. Evans earned his bachelor's degree from Marshall in December 2025. He earned a 3.37 GPA in his Marshall coursework and a 3.66 GPA in his final semester. His teammates elected him team captain. Thus, Evans completed his degree and demonstrated the academic recovery that the NCAA's progress-toward-degree requirements are designed to promote.

**F. Evans Transfer to NC State, Waiver Petition, and Appeal**

60. In January 2026, Evans transferred to NC State to pursue his final season of football. NC State recruited him because of his size, strength, experience, maturity, and ability to contribute immediately on the defensive line. Evans and NC State both understood that he had competed in only three actual seasons – 2021, 2024, and 2025 – because he redshirted in 2022 and was academically ineligible in 2023-24.

61. Beginning in January 2026, NC State Associate Athletic Director for Compliance Kevin Hansen personally investigated and corroborated Evans's hardships using public records – including police reports and court records documenting the killings of Tay-Tay and Evans's close friend, the eviction filing against Evans's mother, and death notices for Evans's great-aunt and Tajh

Boyd – because the NCAA relies on contemporaneous documentation rather than self-narrative to support waiver claims.

62. On March 10, 2026, NC State submitted an extension-of-eligibility waiver on Evans's behalf. The submission identified two participation opportunities Evans had lost for reasons beyond his control: the 2022 season in which the coaching staff elected to redshirt him and the 2023 season in which extraordinary personal hardships caused the academic ineligibility that prevented him from competing. The NCAA denied the waiver on March 30, 2026.

63. On April 9, 2026, NC State submitted a request for reconsideration, providing clarification from UNC Charlotte's compliance office confirming that Evans's GPA deficiency was caused by the NCAA-wide progress-toward-degree requirement, and not merely a discretionary UNC Charlotte institutional policy.

64. The NCAA denied reconsideration on May 20, 2026. The NCAA provided no meaningful interim communication despite follow-up by NC State's compliance staff. The delay consumed time from Evans's expiring eligibility clock and reduced the practical opportunity for him to obtain judicial relief before the 2026 season.

65. On June 12, 2026, NC State submitted a formal appeal to the NCAA Eligibility Appeals Committee. The appeal argued that the totality of Evans's circumstances – including violent loss, family financial crisis, disclosed mental-health struggles, and academic recovery – established that he had been deprived of genuine participation opportunities for reasons beyond his control. NC State cited several other cases, which involved comparable or less compelling hardships and resulted in relief.

66. The NCAA's own stated timeline called for an appeal decision within approximately three weeks. Instead, the Appeals Committee did not issue its decision until July

24, 2026 – approximately one month after its expected deadline and five days before NC State's training camp was scheduled to begin on July 29, 2026. The delay was especially damaging because roster decisions, scholarships, compensation arrangements, and preparation for the 2026 season were occurring while Evans remained ineligible.

67. The July 24, 2026, decision denied Evans's appeal. It stated that Evans "was not denied at least two participation opportunities" because he had "at least four participation opportunities." It treated the 2023-24 academic year as within Evans's control. The decision further stated that the NCAA was "unable to identify any extraordinary circumstances" and repeated, essentially verbatim, the rationale used in the original denial.

68. Since July 24, 2026, Evans has been reclassified as an "alumni player." He may observe practice and use the weight room only when current players are not present, but he cannot be coached, receive a strength-and-conditioning program, participate in team meetings or meals, or receive the benefits the program provides to rostered players. Each day he remains in that status causes additional harm that cannot be restored after the season has passed.

**G. The NCAA's Inconsistent and Arbitrary Enforcement and Bad Faith**

69. The NCAA's denial did not result from a good-faith, individualized review of Evans's circumstances.

70. Beginning in February 2022, the NCAA Division I Committee for Legislative Relief recommended that the NCAA's full-time national-office reinstatement staff deny extension-of-eligibility and season-of-competition waiver requests as a general matter rather than adjudicate them on their individual merits. NCAA Division I Committee for Legislative Relief Information Standards, Guidelines and Directives (Updated August 1, 2024), attached as Exhibit 2.

71. NCAA President Charlie Baker has reinforced that posture publicly. Baker has declared that the NCAA is "going to fight them all" with respect to waiver-eligibility litigation and has characterized athletes seeking waivers as "failed professionals" who use college sports as a fallback option and allegedly rob the next class of young athletes of scholarships. Those statements reveal an embedded hostility toward the very athletes for whose benefit the waiver process exists – ones who, like Evans, have had serious personal hardship steal a season of eligibility.

72. Additionally, the process afforded Evans – like all other athletes – no independent role in the petition process. He was not a party to the NCAA's review, had no direct right to initiate or appeal the waiver separate from his institutions.

73. The NCAA has granted relief in other cases with comparable or less compelling facts. Those cases involved, among other things, a cousin's shooting, a grandmother's death, housing instability, a parent's serious illness or death, a GPA deficiency, and mental-health circumstances. Yet the NCAA denied Evans relief despite the combination of two homicides five days apart, a close friend's suicide, his great-aunt's death, his mother's eviction crisis, and his immediate academic recovery.

74. The NCAA also unnecessarily delayed the appeal decision. The delay exceeded the NCAA's own approximately three-week timeline and the NCAA's decision was transmitted just days before NC State's training camp was scheduled to begin. Evans was left without a decision while roster spots, scholarship arrangements, NIL opportunities, revenue-sharing arrangements, and team preparation were being finalized. The timing maximized the practical harm of the denial and reduced the opportunity for meaningful relief before the season began

75. The NCAA's stated rationale is not credible. The Committee concluded that it could identify no extraordinary circumstances in Evans's case. That conclusion could be reached only by disregarding the totality of the circumstances and the NCAA's own waiver standards.

76. Further, the NCAA's blanket-denial directive, public rhetoric, failure to consider the full evidentiary record, inconsistent treatment of comparable athletes, unexplained delay, and incredible rationale demonstrate that the NCAA did not administer its waiver process in good faith. Instead, the NCAA used its eligibility rules and institution-only process to exclude Evans from the 2026-27 market for Division I football services

**H. The NCAA's Rule of Restitution**

77. NCAA Bylaw 12.9.4.2, known as the Rule of Restitution, permits the NCAA to take retroactive action against an institution when an allegedly ineligible athlete competes pursuant to a court restraining order or injunction and that injunction is later vacated, stayed, reversed, or determined to have been unjustified. The Rule thus threatens an institution even when it follows a court order.

78. The Rule of Restitution authorizes severe retroactive punishment, including vacating wins, imposing postseason bans, requiring the return of television revenue, and assessing financial penalties. Its practical effect is to deter NC State from relying on judicial relief and to make the NCAA's eligibility decision effectively unreviewable during the only season in which relief can matter.

79. Because of this, Courts have routinely recognized the need to enjoin enforcement of the Rule of Restitution when an athlete competes under judicial protection. *See Pavia v. NCAA*, 760 F. Supp. 3d 527 (M.D. Tenn. 2024); *Braham v. NCAA*, 794 F. Supp. 3d 824 (D. Nev. 2025);

*Martinson v. NCAA*, 2025 WL 2678049 (D. Nev. Sep. 18, 2025). Those decisions recognize that the Rule cannot be used to nullify a court's ability to provide timely and effective relief

80. Unless the NCAA is enjoined from enforcing the Rule of Restitution against NC State for complying with this Court's order, the NCAA's threatened penalties will deter the institution from permitting Evans to practice and compete, defeat the purpose of preliminary relief, and cause Evans to lose the 2026 season before his claims can be adjudicated. The Rule should therefore be enjoined as applied to Evans and NC State.

## CAUSES OF ACTION

### COUNT I – VIOLATION OF THE SHERMAN ANTITRUST ACT
### 15 U.S.C. § 1

81. Evans incorporates by reference all preceding paragraphs as though fully set forth herein.

82. The NCAA and its member institutions, through the Five-Year Rule and the extension-of-eligibility waiver process, have entered into and implemented a contract, combination, and conspiracy that unreasonably restrains trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The agreement limits which athletes may provide Division I football services and for how many seasons, and it conditions access to the market on approval by the NCAA's centralized waiver bureaucracy.

83. The relevant market is the nationwide labor market for Division I Football Bowl Subdivision ("FBS") football players, including the market in which NCAA member institutions compete to recruit, retain, and compensate athletes for their athletic services. The market also includes the NIL compensation, revenue-sharing payments, scholarship benefits, and professional-development opportunities tied to eligibility to compete in Division I FBS football.

84. NCAA Division I institutions otherwise compete horizontally for elite football talent. By adopting and enforcing the Constitution, Bylaws, Five-Year Rule, and waiver process through collective member votes, those competing institutions agreed not to field a athlete beyond the eligibility period unless the NCAA grants a waiver. The agreement is horizontal because it is made among competing buyers of football labor and is facilitated and enforced by the NCAA.

85. The NCAA and its member institutions possess monopsony power in the relevant market. For an athlete seeking the combination of Division I competition, elite coaching and facilities, national exposure, scholarship benefits, NIL and revenue-sharing compensation, and a pathway to the NFL, there is no practical substitute for NCAA Division I football. The NCAA is the sole gatekeeper of eligibility and therefore controls the only realistic market in which Evans can supply his services on those terms.

86. The challenged rules and their application to Evans – and all similarly situated athletes – produce substantial anticompetitive effects. They artificially restrict the supply of experienced football labor available to NC State and other member institutions, suppress the compensation Evans and others can earn by eliminating an entire season of NIL income, revenue-sharing compensation, and scholarship value, reduce the quality and output of competition for fans and broadcasters, and deprive Evans and others of on-field development and exposure needed for NFL evaluation. These effects are the direct and foreseeable result of denying waivers rather than adjudicating them individually on the merits.

87. The NCAA cannot establish a legitimate procompetitive justification for excluding Evans or others like him.

88. Further, less restrictive alternatives are available. The NCAA could apply Bylaw 12.6.1.7.1.3 in good faith on a case-by-case basis, weigh the totality of documented hardships

rather than isolating each event, review the complete evidentiary record before speculating about an unfiled PTD waiver, abandon the 2022 blanket-denial directive, use an independent third party to adjudicate petitions and appeals, or provide athletes a direct and independent right to initiate, participate in, and appeal waiver requests. Each alternative would preserve any legitimate interest in eligibility integrity while avoiding the exclusionary effects inflicted on Evans.

89. As a direct and proximate result of the NCAA's violation of Section 1, Evans and others have suffered antitrust injury, including the loss of the 2026 season, NIL compensation, revenue-sharing compensation, a full athletic scholarship, on-field development, national exposure, and professional football opportunities. The injury is to Evans's business and property and flows directly from his exclusion from the relevant market.

90. Evans is entitled to injunctive relief and to recover treble damages, together with attorneys' fees and costs and all other relief permitted by law.

**COUNT II – BREACH OF CONTRACT**
**Third-Party Beneficiary**

91. Evans incorporates by reference all preceding paragraphs as though fully set forth herein.

92. The NCAA and each of its member institutions, including NC State, have entered into a valid and enforceable membership agreement under which member institutions agree to abide by the NCAA's Constitution, Bylaws, and Division I Manual, and the NCAA agrees to administer, interpret, and apply those rules. The NCAA Manual expressly confirms the binding nature of this framework by providing that "division membership criteria constitute enforceable legislation" and that each member institution "shall comply with all applicable criteria of its division."

93. Evans is an intended third-party beneficiary of the membership agreement. The NCAA's eligibility and waiver Bylaws were adopted for the direct benefit of athletes whose seasons of competition, eligibility, financial aid, and access to athletics compensation they regulate. Evans is a member of the specifically identifiable class of athletes protected by those provisions and has a direct interest in their enforcement.

94. Numerous courts have recognized the status of athletes as intended third-party beneficiaries of those agreements.

95. The eligibility and waiver provisions are specific, concrete, and operational. They define the class of athletes whose seasons are subject to the Five-Year Rule, establish criteria for additional eligibility, and vest the NCAA with authority to grant relief for circumstances beyond an athlete's control or of extraordinary or extreme hardship. The waiver process exists for the benefit of athletes facing hardship, and the NCAA's Constitution and Bylaws promise well-being, fair competition, fairness, and individualized consideration.

96. The NCAA breached the contract by denying Evans's waiver and appeal inconsistently with its own published standards and internal precedent.

97. The NCAA further breached the contract by applying an undisclosed blanket-denial directive instead of conducting the individualized review its Bylaws promise.

98. The NCAA also did not offer or permit Evans to directly participate in the adjudication of his petition and, instead, used a closed-paper process.

99. The NCAA also breached the contract by speculating about the outcome of a PTD waiver that UNC Charlotte never filed.

100. The NCAA breached the contract by treating Evans's academic ineligibility as a circumstance "within his control" without considering that it resulted from extraordinary,

documented trauma, a transfer-related GPA reset, and UNC Charlotte's failure to pursue a PTD waiver.

101. Finally, the NCAA breached the contract by finding that it could identify no extraordinary circumstances warranting relief. That conclusion disregarded the multiple homicides, close friend's suicide, great-aunt's death, eviction crisis, academic recovery, and graduation documented in Evans's petition. It also disregarded Bylaw 12.6.1.7.1.3, which expressly reserves authority to review requests for circumstances of extraordinary or extreme hardship.

102. As a direct and proximate result of the NCAA's breaches, Evans has suffered and will continue to suffer damages, including the loss of NIL income, revenue-sharing compensation, scholarship benefits, the opportunity to compete at NC State, professional football earning opportunities, and other economic and non-economic harm.

**COUNT III – BREACH OF CONTRACT**
**Good Faith and Fair Dealing**

103. Evans incorporates by reference all preceding paragraphs as though fully set forth herein.

104. North Carolina law implies a covenant of good faith and fair dealing in every contract. The covenant requires each party to refrain from conduct that deprives the other party of the benefits of the agreement. As an intended third-party beneficiary, Evans is entitled to enforce the covenant against the NCAA and to require the NCAA to exercise its eligibility discretion honestly, consistently, and in accordance with the purpose of its Bylaws.

105. First, the NCAA breached the covenant by adopting and applying the 2022 blanket-denial directive. Maintaining a predetermined denial policy while presenting the appearance of merits-based and individualized review is bad faith.

106. Second, the NCAA breached the covenant by applying its standards inconsistently and granting waivers on materially similar or less compelling facts. Good faith requires consistent application of published standards to similarly situated athletes.

107. Third, the NCAA breached the covenant by failing to review the available evidence and by not allowing Evans an opportunity to be heard.

108. Fourth, the NCAA breached the covenant by espousing express institutional hostility toward athletes seeking the benefit of the NCAA's own waiver criteria, labeling them "failed professionals" in published statements. Such comments are direct evidence that the NCAA approaches waiver matters – like Evans's – as an adversary matter rather than as an administrator bound to protect athletes,

109. Fifth, the NCAA breached the covenant by deliberately delaying its appeal decision.

110. Sixth, the NCAA breached the covenant through the incredibility of its stated rationale. The Committee claimed it could identify no extraordinary circumstances in Evans's case. A good-faith application of the NCAA's own standard could not disregard that totality of circumstances

111. As a direct and proximate result of the NCAA's breach of the implied covenant, Evans has suffered and will continue to suffer lost NIL income, revenue-sharing compensation, scholarship benefits, professional-development opportunities, NFL exposure, and other economic and non-economic harm.

**COUNT IV – DECLARATORY JUDGMENT**

112. Evans incorporates by reference all preceding paragraphs as though fully set forth herein

113. An actual and justiciable controversy exists between Evans and the NCAA concerning whether the NCAA's denial of the extension-of-eligibility waiver, its enforcement of the Five-Year Rule, and its Rule of Restitution violate federal antitrust law and the NCAA's contractual and good-faith obligations. The controversy is concrete and immediate because the NCAA's decision presently bars Evans from participating in the 2026 season and deprives him of associated economic and professional opportunities

114. Evans is entitled to a declaration that the NCAA's denial and enforcement of the challenged eligibility rules violate Section 1 of the Sherman Act and the NCAA's contractual obligations and implied covenant of good faith and fair dealing. A declaration will resolve the parties' rights and obligations and provide a necessary basis for injunctive relief compelling the NCAA to grant Evans one additional season of eligibility at NC State.

## PRAYER FOR RELIEF

**WHEREFORE**, Evans respectfully requests that this Court:

A. Enter a declaratory judgment that the NCAA's denial of Evans's waiver and enforcement of the Five-Year Rule as applied to Evans violate Section 1 of the Sherman Act and the NCAA's contractual and good-faith obligations;

B. Grant preliminary and permanent injunctive relief restraining and enjoining the NCAA from enforcing, applying, or attempting to enforce its denial of Evans' waiver petition and appeal, as well as any NCAA Bylaw, to bar or restrict Evans from practicing, training, conditioning, traveling, dressing, scrimmaging, competing, or otherwise participating in all activities and opportunities available to eligible Division I athletes during the 2026-2027 season, including participation in any institutional revenue-sharing or NIL opportunities available to eligible athletes;

C. Grant preliminary and permanent injunctive relief compelling the NCAA to immediately grant Evans one additional year of eligibility for the 2026-27 season at NC State and enjoining the NCAA from preventing Evans from participating in team activities, practices, games, and competition or any other benefit of eligible athletes;

D. Granting preliminary and permanent injunctive relief restraining and enjoining the NCAA from taking any action inconsistent with Evans's status as an eligible Division I athlete for the 2026-2027 academic year;

E. Grant preliminary and permanent injunctive relief enjoining the NCAA from enforcing the Rule of Restitution, or taking any other action to harm or threaten harm, against Evans, NC State, or any other person for complying with this Court's order;

F. Grant preliminary and permanent injunctive relief enjoining the NCAA from enforcing the Rule of Restitution against Evans, NC State, or any other person for complying with this Court's order

G. Award Evans compensatory damages for lost NIL income, revenue-sharing compensation, scholarship benefits, professional-development opportunities, and all other economic harm;

H. Award Evans treble damages;

I. Award Evans reasonable attorneys' fees, costs, and expenses as permitted by law;

J. Award Evans pre-judgment and post-judgment interest; and

K. Grant Evans such other and further relief as the Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiff KaTron Evans hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted this 7tth day of August, 2026.

/s/ Tricia Wilson Magee
Tricia Wilson Magee, N.C. Bar No.: 31875
Shumaker, Loop & Kendrick, LLP
101 S. Tryon St., Suite 2200
Charlotte, NC 28280-0002
Telephone: 704-945-2961
tmagee@shumaker.com

and

Diana J. Florence (PHV Forthcoming)
Nicholas T. Stack (PHV Forthcoming)
Shumaker, Loop & Kendrick, LLP
1000 Jackson Street

Toledo, Ohio 43604
Telephone: 419- 241-9000
dflorence@shumaker.com
nstack@shumaker.com

*Attorneys for Plaintiff*