# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
## CIVIL ACTION NO.: 5:26-cv-00552-FL

KATRON EVANS,

       Plaintiff,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

       Defendant.

**INDEX OF EXHIBITS TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

| Exhibit | Description |
|---|---|
| 1 | Declaration of KaTron Evans |
| 2 | Declaration of Kevin Hansen |
| 3 | Declaration of Coach Dave Doeren |
| 4 | Declaration of Coach Elisha Shaw |
| 5 | Declaration of David Berri |
| 6 | Declaration of Nicole Gould |
| 7 | Declaration of Brennan Kennedy |
| 8 | Declaration of Sophie Clody |

Respectfully submitted this 7th day of August, 2026.

/s/ Tricia Wilson Magee
Tricia Wilson Magee, N.C. Bar No.: 31875
Shumaker, Loop & Kendrick, LLP
101 S. Tryon St., Suite 2200
Charlotte, NC 28280-0002
Telephone: 704-945-2961
tmagee@shumaker.com

# EXHIBIT 6

## Declaration of Nicole Gould

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CIVIL ACTION NO.: 5:26-cv-00552-FL**

KATRON EVANS,

        Plaintiff,

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,

        Defendant.

### DECLARATION OF NICOLE GOULD

I, Nicole T. Gould, declared under penalty of perjury as follows:

1. I am over eighteen (18) years of age and competent to testify regarding the matters stated herein. All statements are based upon my personal knowledge.

2. I am a former Division I NCAA Senior Associate Athletic Director for Compliance with more than twenty (20) years of experience in NCAA Division I athletics compliance.

3. Throughout my career, I served in senior compliance leadership positions at four Division I institutions: Delaware State University, Morgan State University, Towson University, and Howard University. In these roles, I was responsible for overseeing all aspects of NCAA compliance operations, including interpreting and applying NCAA legislation, certifying student-athlete eligibility, administering athletics financial aid compliance, investigating potential NCAA violations, conducting institutional compliance risk assessments, developing and implementing compliance policies and procedures, providing NCAA rules education to institutional stakeholders, and advising university presidents, directors of athletics, coaches, registrars, faculty athletics representatives, and legal counsel on complex NCAA legislative matters.

4. Additionally, I developed and authored numerous NCAA waiver requests and institutional statements seeking legislative relief on behalf of student-athletes. I am recognized for my ability to analyze complex eligibility matters, identify applicable NCAA legislative relief, and prepare persuasive waiver submissions that accurately document extraordinary circumstances while remaining consistent with NCAA legislation, interpretations, and established waiver guidelines.

5. My professional experience includes collaborating with university leadership, coaches, faculty, registrars, legal counsel, and student-athletes to achieve compliant and equitable outcomes in matters involving NCAA eligibility and legislative relief.

6. Based upon my education, training, and more than two decades of professional experience in NCAA Division I compliance, I possess specialized knowledge regarding NCAA legislation, waiver standards, eligibility determinations, and institutional compliance practices.

7. Having had the privilege of serving at multiple NCAA Division I institutions, I successfully developed and submitted numerous NCAA waivers, including Progress-Toward-Degree (PTD) Waivers, Medical Hardship Waivers, Season of Competition Waivers, and Transfer Waivers.

8. These waivers were prepared to restore or extend the eligibility of student-athletes who met the applicable NCAA legislative criteria and experienced extraordinary circumstances beyond their control. Through the successful preparation and submission of these waivers, student-athletes were afforded equitable opportunities to continue both their academic pursuits and intercollegiate athletic careers in accordance with NCAA legislation.

9. Based on my knowledge, experience, and understanding of the NCAA waiver submission process, I was asked to provide this declaration to assist the Court in understanding

NCAA legislation and compliance procedures. Specifically, I was asked to explain NCAA legislation in a manner that is understandable to individuals who are not NCAA compliance experts; describe standard NCAA compliance practices, including how member institutions interpret and apply NCAA bylaws; explain the development, documentation, and evaluation of NCAA waivers, specifically a Progress-Toward-Degree (PTD); and provide factual testimony regarding my personal involvement in preparing student-athlete waivers, drafting institutional statements, interpreting NCAA legislation.

10.     KaTron Evans initially enrolled at Jackson State University in Fall 2021 and remained there through Fall 2022. He participated during the Fall 2021 football season and, during the Fall 2022 season, appeared in only one football game, thereby preserving a redshirt year under NCAA Bylaw 12.8.3.1.6 (the four-game rule).

11.     During the Fall 2022 semester, KaTron experienced the murder of his cousin ("Tay-Tay"), with whom he lived and whom he considered a sister figure. Approximately one week later, a close friend, who was also the boyfriend of KaTron's cousin, was murdered. In the aftermath of these tragedies, KaTron's mother failed to complete a required recertification for a low-income housing subsidy due to the family's grief and disruption. As a result, the family was unable to maintain its rent payments, and eviction proceedings were initiated in December 2022. To prevent his family from becoming homeless, KaTron used a portion of his scholarship funds to assist with housing expenses.

12.     Also in December 2022, KaTron's head football coach departed Jackson State for the University of Colorado.

13.     Subsequently, in January 2023, KaTron transferred to the University of North Carolina at Charlotte.

14. At Charlotte, KaTron reunited with a coach he had previously known from St. Francis. Pursuant to NCAA transfer legislation, KaTron's GPA reset to 0.00. In other words, even though the majority of KaTron's academic credits transferred to Charlotte, his grades from Jackson State including grades earned in every semester before the string of personal tragedies in the fall of 2022 did not.

15. While continuing to cope with the cumulative trauma from Fall 2022 and his family's ongoing housing instability, KaTron enrolled in 16 credit hours at Charlotte and started with a 0.00 GPA.

16. As the semester progressed, he began experiencing academic difficulties unlike those he had encountered previously. Charlotte advised him to reduce his course load to 12 credit hours.

17. In April 2023, KaTron suffered another devastating loss when his great-aunt, whom he regarded as his grandmother, died suddenly from a heart-related condition. By the time Charlotte's academic staff recognized the extent of his academic struggles in a sociology course, the institutional deadline to elect a pass/fail grading option had expired.

18. KaTron ultimately earned a 1.25 GPA for the Spring 2023 semester, consisting of two D grades, one F, and one B. Had the sociology course been converted to pass/fail before the applicable deadline, he would have needed to successfully complete only two three-credit-hour summer courses to satisfy the NCAA's 1.9 cumulative GPA requirement for Progress-Toward-Degree ("PTD") purposes, rather than attempting to raise his cumulative GPA from approximately 1.2 to 1.9.

19. During the Summer 2023 term, while attempting to regain academic eligibility by completing nine credit hours, KaTron experienced yet another tragedy when his longtime friend

and former youth football teammate, Tajh Boyd, a football student-athlete at Liberty University, died by suicide.

20. The cumulative emotional impact of four significant deaths, his family's housing instability, and the resulting emotional trauma contributed to KaTron failing one summer course and withdrawing from another. He completed the summer with a 1.57 cumulative GPA, below the 1.9 threshold required under NCAA Bylaw 14.4.4.3, rendering him academically ineligible for the Fall 2023 season.

21. Based upon my review of the facts, my experience administering NCAA legislation, and the NCAA's published waiver guidance and prior approved waiver decisions, KaTron's circumstances satisfied the criteria for consideration of a Progress-Toward-Degree waiver. Nevertheless, Charlotte did not prepare or submit a PTD waiver before certifying him as academically ineligible.

22. In total, KaTron endured four significant deaths within an approximately ten-month period, from October 2022 through Summer 2023, while simultaneously navigating a transfer between institutions after his head coach left, a transfer-related GPA reset, ongoing family housing instability, and the resulting academic consequences.

23. Based on the foregoing timeline and my experience administering NCAA legislation, Charlotte's first opportunity to pursue PTD relief arose immediately after final Summer 2023 grades confirmed that KaTron did not satisfy the NCAA's 1.9 cumulative GPA requirement.

24. Once those grades were posted in late July or early August 2023, Charlotte knew, or reasonably should have known, that KaTron was academically deficient under NCAA Bylaw 14.4.3.3

> *A student-athlete who is entering the second year of collegiate enrollment shall present a cumulative grade-point average required for graduation. A student-*

*athlete who is entering the third year of collegiate enrollment shall present a cumulative minimum grade-point average (based on a maximum of 4.00) that equals 95 percent of the institution's overall cumulative minimum grade-point average required for graduation. A student-athlete who is entering the fourth or later year of collegiate enrollment shall present a cumulative minimum grade-point average required for graduation. If the institution does not have an overall grade-point average required for graduation, it is permissible to use the lowest grade-point average required for any of the institution's degree programs in determining the cumulative minimum grade-point average. The minimum grade-point average must be computed pursuant to institutional policies applicable to all students. (Adopted: 1/10/92 effective 8/1/92. Revised:10/31/02 effective 8/1/03, 4/15/06)*

25.     Once Charlotte determined that KaTron failed to satisfy the applicable cumulative GPA requirement following the posting of his Summer 2023 grades, the institution had a responsibility to evaluate whether documented extenuating circumstances warranted seeking relief through the NCAA Progress-Toward-Degree (PTD) waiver process before certifying him academically ineligible.

26.     Based upon my more than twenty (20) years of Division I NCAA compliance experience, it is standard compliance practice for an institution to gather all relevant contemporaneous documentation, consult with appropriate academics and athletics personnel, and submit a PTD waiver whenever objective evidence demonstrates that circumstances beyond the student-athlete's control directly contributed to the academic deficiency.

27.     Consistent with standard NCAA compliance practice, the institution could have and should have prepared and submitted a PTD waiver per Bylaw 14.4.3.10:

*The Progress-Toward-Degree Waivers Committee shall have the authority to waive all other progress-toward-degree requirements based on objective evidence that demonstrates circumstances that warrant the waiver of the normal application of those regulations. The committee shall establish the process for granting such waivers and shall report annually to the Committee on Academics and the membership the actions taken in summary, aggregate form (Adopted: 1/9/96 effective 8/1/96, Revised: 10/28/97, 11/01/07 effective 8/1/08, 1/16/10 effective 5/1/10, 8/7/14)*

28. The standard governing PTD waivers under NCAA Bylaw 14.4.3.10 authorizes the NCAA Progress-Toward-Degree Waivers Committee to waive the normal application of the PTD legislation when objective evidence establishes circumstances warranting such relief. In my professional opinion, the committee's review focuses on whether the institution has demonstrated, through credible and contemporaneous documentation, that extraordinary circumstances outside the student-athlete's control directly caused the failure to satisfy the applicable academic benchmark.

29. Based upon my review of the contemporaneous records, supporting documentation, and the factual timeline in this matter, it is my expert opinion that KaTron's circumstances satisfied that standard. The deaths, the financial hardship, the housing instability that followed, and the direct impact those events had on his academic performance constituted objective, documented extenuating circumstances beyond his control. Those circumstances were not the result of a lack of academic ability, effort, or personal misconduct, but rather significant life events that materially affected his ability to satisfy the NCAA's Progress-Toward-Degree requirements.

30. In my opinion, had Charlotte timely developed and submitted a PTD waiver before the commencement of the Fall 2023 football season and prior to certifying KaTron academically ineligible, the available contemporaneous evidence would have presented a compelling basis for relief under NCAA Bylaw 14.4.3.10. Based on my experience developing, reviewing, and administering NCAA waivers, I believe the waiver would have met the NCAA's objective evidence standard and should have been granted.

31. Charlotte's failure to pursue a PTD waiver deprived the NCAA of the opportunity to evaluate KaTron's documented extenuating circumstances under the procedures specifically established for that purpose. As a result, KaTron was declared academically ineligible without the

benefit of the relief mechanism that the NCAA bylaws expressly provide for student-athletes whose academic deficiencies are attributable to extraordinary circumstances beyond their control.

32. Additionally, NCAA waiver requests are institutional requests, not student-athlete requests. Under the NCAA Division I governance structure, a student-athlete does not have the authority to independently submit a Progress-Toward-Degree waiver, season-of-competition waiver, or other eligibility waiver directly to the NCAA, nor may the student-athlete independently appeal the denial of such a waiver. Rather, the member institution, acting through its athletics compliance office and other designated institutional representatives, is solely responsible for evaluating the circumstances, developing the waiver request, compiling the supporting documentation, submitting the waiver to the NCAA, responding to requests for additional information, and, when appropriate, appealing an adverse decision.

33. Accordingly, a student-athlete is entirely dependent upon his or her institution to identify potential NCAA relief, advise the student-athlete regarding available waiver options, gather the necessary documentation, and timely present the student's case to the NCAA. Even if a student-athlete is aware that a waiver process exists, the student-athlete has no procedural mechanism through which to independently invoke the NCAA's waiver process or obtain review by the NCAA absent institutional action.

34. In KaTron's case, once Charlotte determined that he failed to satisfy the applicable Progress-Toward-Degree requirements, it became the institution's responsibility to determine whether extenuating circumstances warranted pursuing NCAA relief.

35. Because Charlotte never submitted a Progress-Toward-Degree waiver on his behalf, KaTron was deprived of any opportunity to have the NCAA review the merits of his documented extenuating circumstances. Likewise, because no waiver was ever filed, there was no

NCAA decision from which an institutional appeal could be taken. As a result, KaTron never received the review contemplated by the NCAA's waiver process, not because the NCAA rejected his request, but because the request was never presented to the NCAA by the institution that possessed the exclusive authority to do so.

36. In my professional opinion, this distinction is significant. The NCAA's waiver process depends upon member institutions fulfilling their responsibilities under NCAA legislation. When an institution fails to identify, prepare, and submit an available waiver, the student-athlete has no independent avenue through which to seek NCAA review. Consequently, the institution's inaction effectively forecloses the student-athlete's opportunity to obtain the relief that the NCAA's waiver process is designed to provide.

37. Charlotte later acknowledged that it had not "exhausted all options" available to KaTron and further indicated that, had it been aware of his extraordinary personal circumstances, it likely would have pursued PTD relief on his behalf.

38. In my professional opinion, the appropriate time for Charlotte to submit a PTD waiver was immediately after Summer 2023 grades were finalized and before Fall 2023 eligibility certifications were completed.

39. Although Charlotte has stated that it was unaware of the full extent of KaTron's hardships, I find that explanation difficult to reconcile with the circumstances. As a former NCAA compliance administrator, it is my opinion that it is highly unlikely Charlotte was entirely unaware of the extraordinary hardships surrounding a recently recruited transfer student-athlete, particularly where he transferred to an institution employing a coach with whom he had a longstanding relationship dating back to high school.

40. When KaTron's documented hardships are evaluated alongside the NCAA's published waiver guidance and prior approved cases involving family deaths, violent crime, housing instability, mental health crises, and academic deficiencies resulting from extraordinary circumstances, his case falls squarely within the category of cases that have historically warranted favorable relief.

41. In my experience, where such circumstances are thoroughly documented and accompanied by a credible academic recovery plan demonstrating continued progress toward graduation, Progress-Toward-Degree waivers are not merely viable, they are routinely approved under a consistent application of NCAA waiver principles.

42. In my professional opinion, the outcome in KaTron Evans' case was not the product of a single unfortunate event, but rather the cumulative result of missed opportunities at the institutional level and an inconsistent application of the NCAA's waiver process. The extraordinary hardships KaTron endured including multiple violent deaths of close family members and friends, the sudden death of a grandmother figure, his family's housing instability, and the emotional and financial burdens he assumed while attempting to remain academically eligible – were circumstances entirely outside of his control. Those hardships directly coincided with the only period in his collegiate career in which he experienced significant academic difficulty.

43. Based upon my experience administering NCAA legislation and preparing successful waiver requests, Charlotte had the first meaningful opportunity to seek Progress-Toward-Degree relief on KaTron's behalf immediately after his Summer 2023 grades were finalized and before certifying him as academically ineligible for the Fall 2023 season.

44.     Despite the existence of extraordinary mitigating circumstances, Charlotte did not prepare or submit a PTD waiver, did not otherwise seek NCAA relief, and later acknowledged that it had not "exhausted all options" available to KaTron and that, had it been aware of his personal circumstances, it likely would have filed such a waiver. As a result, KaTron lost the opportunity to have his eligibility considered at the time the academic deficiency first arose.

45.     When KaTron later transferred to North Carolina State University as a graduate student, NC State undertook the work that had never previously been done. The institution conducted a comprehensive investigation, gathered contemporaneous documentation, reconstructed the factual record, obtained supporting evidence from multiple sources, researched comparable NCAA precedent, and submitted an Extension-of-Eligibility waiver to the NCAA on March 10, 2026. In my opinion, the evidence submitted demonstrated that KaTron satisfied the criteria for waiver relief under the NCAA's published guidelines and was at least as compelling as numerous cases in which the NCAA had previously granted relief.

46.     By the time the waiver reached the NCAA, however, KaTron was seeking restoration of an opportunity that should have been addressed years earlier. Had Charlotte pursued a PTD waiver during the appropriate eligibility window in 2023, the NCAA would have had the opportunity to evaluate his hardships contemporaneously, when the academic deficiency first occurred and before the consequences became permanent. Instead, the failure to pursue available relief required NC State to seek extraordinary relief after KaTron had exhausted every other avenue available to him.

47.     In my professional opinion, KaTron's academic deficiency was not the result of a lack of ability, effort, or commitment. Rather, it was the direct consequence of extraordinary and documented circumstances beyond his control.

48. In fact, KaTron later demonstrated his academic capability by regaining eligibility, earning a 2.75 GPA while at Marshall University, and graduating within his five-year eligibility window. Those facts, coupled with the unprecedented hardships he endured and the NCAA's own published precedent, strongly supported granting his waiver request.

49. The failure to pursue timely relief at Charlotte, followed by the NCAA's denial of NC State's later waiver despite substantial supporting documentation, deprived KaTron of the opportunity to compete in the final season of eligibility that, in my professional opinion, the NCAA waiver process was designed to protect under circumstances such as these.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 8/4/2026

_____
Nicole T. Gould
Former SR Associate Athletic Director for
Athletics Compliance Owner of College Compliant Athlete

**REFERENCES**

National Collegiate Athletic Association. (2025). *2025–2026 NCAA Division I manual*. NCAA.

NC State Appeal Statement

NCAA Appeals denial

NC State Case file

Kamesha Evans Mother State

Lavan Jenkins Statement

PTB Waiver Case Precedent

"Statement by Kevin Hansen"

**CERTIFICATE OF SERVICE**

I hereby certify that on this date the foregoing **DECLARATION** was served by depositing a true and correct copy thereof in an official depository of the U.S. Mail, postage prepaid, and was also served via email, addressed to the following:

National Collegiate Athletic Association
c/o Jared Tidemann, Director of Legal Affairs
and Senior Counsel of Government and Sports Administration
700 W. Washington Street
Indianapolis, IN 46206-6222
jtidemann@ncaa.org

This 7th day of August, 2026.

/s/ Tricia Wilson Magee
Tricia Wilson Magee